**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

BIOAGILYTIX LABS, LLC,

              Plaintiff,

    v.

JAMES MCNALLY and SWORD BIO, INC.,

         Defendants.

Civil Action No. 1:25-CV-11168-GAO

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................2

STATEMENT OF FACTS ......................................................................................................3

ARGUMENT ..........................................................................................................................4

I.  BIOAGILYTIX IS LIKELY TO SUCCEED ON THE MERITS OF ITS
    DTSA AND MUTSA CLAIMS ...............................................................................4

    A.  The Information at Issue is a Trade Secret ................................................4

    B.  McNally Used Improper Means to Acquire the Trade Secrets ...............8

        1.  Breach of McNally's Contractual Provisions ...............................8

        2.  Breach of the Media Protection Policy .......................................10

        3.  Access without any legitimate business reason ..........................11

II. BIOAGILYTIX IS LIKELY TO SUCCEED ON THE MERITS OF ITS
    CONTRACT CLAIMS ...........................................................................................12

    A.  The Non-Compete Provision is Enforceable under Massachusetts
        and Delaware Law.......................................................................................12

        1.  The Non-Compete Provision is Reasonable in Time and
            Space......................................................................................................14

        2.  The Non-Compete Provision Advances BioAgilytix's
            Legitimate Interests ...........................................................................15

    B.  The Non-Solicitation Provisions are Enforceable Under Delaware
        and Massachusetts Law ..............................................................................18

    C.  McNally Is in Breach of His Non-Compete and Non-Solicitation
        Provisions .....................................................................................................19

III. BIOAGILYTIX WILL SUFFER IRREPARABLE HARM ABSENT A
     TEMPORARY RESTRAINING ORDER .............................................................20

IV.  THE BALANCE OF THE HARMS WEIGH IN FAVOR OF
     GRANTING THE TRO ...........................................................................................23

V.   PUBLIC INTEREST SUPPORTS ISSUANCE OF A TEMPORARY
     RESTRAINING ORDER........................................................................................24

i

CONCLUSION........................................................................................................................24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.R.S. Servs. v. Morse,*
  2013 WL 2152181 (Mass. Super. April 5, 2013) ........................................................... 14, 22

*Allstate Ins. Co. v. Fougere,*
  79 F. 4th 172 (1st Cir. 2023) ................................................................................. 7, 9, 20

*Avaya, Inc. v. Ali,*
  2012 WL 2888474 (D. Mass. July 13, 2012) ..................................................................14

*Boston Centerless, Inc. v. DeSantis,*
  2022 WL 16639138 (D. Mass. Nov. 2, 2022) ..................................................................21

*Boston Scientific Corp. v. Lee,*
  2014 WL 1946687 (D. Mass. May 14, 2014) ....................................................................8

*Cynosure LLC v. Reveal Lasers LLC,*
  2022 WL 18033055 (D. Mass. Nov. 9, 2022) ..................................................... 12, 18, 24

*DraftKings Inc. v. Hermalyn,*
  732 F. Supp. 3d 84 (D. Mass.), *aff'd*, 118 F.4th 416 (1st Cir. 2024) ............................*passim*

*EDIX Media Grp., Inc. v. Mahani,*
  2006 WL 3742595 (Del. Ch. Dec. 12, 2006) ..................................................................13

*EMC Corp. v. Allen,*
  1997 WL 1366836 (Mass. Super. Ct. Dec. 15, 1997) ......................................................14

*EMC Corp. v. Pure Storage, Inc.,*
  2016 WL 7826662 (D. Mass. Aug. 19, 2016) ....................................................................6

*Found. Med., Inc. v. Kittle,*
  2025 WL 563067 (D. Mass. Feb. 20, 2025) ....................................................... 15, 18, 24

*FrontRunner HC, Inc. v. Waveland RCM, LLC,*
  2020 WL 7321161 (D. Mass. Dec. 11, 2020) ..................................................................7, 9

*G&L Plumbing, Inc. v. Kibbe,*
  699 F. Supp. 3d 96 (D. Mass 2023) ................................................................................8

*Grimes & Co., Inc. v. Carlson,*
  2024 WL 5110193 (D. Mass. Dec. 12, 2024) ..................................................................23

*Kan-Di-Ki, LLC v. Suer*,
   2015 WL 4503210 (Del. Ch. July 22, 2015)................................................................13, 15, 16

*Lombard Med. Tech., Inc. v. Johannessen*,
   729 F. Supp. 2d 432 (D. Mass. 2010) ........................................................................................16

*New England Controls, Inc. v. Pilsbury*,
   2018 WL 3150223 (D. Mass. June 27, 2018)..............................................................................23

*Nuance Commc'ns, Inc. v. Kovalenko*,
   2022 WL 237112 (D. Mass. June 29, 2022) ................................................................................14

*NuVasive, Inc. v. Day*,
   2019 WL 2287709 (D. Mass. May 29, 2019), *aff'd*, 954 F.3d 439 (1st Cir. 2020) ...........13

*O'Leary v. Telecom Res. Serv., LLC*,
   2011 WL 379300 (Del. Super. Ct. Jan. 14, 2011)......................................................................14

*Optos, Inc. v. Topcon Med. Sys.*,
   777 F. Supp. 2d 217 (D. Mass 2011) ...........................................................................................5

*Oxford Glob. Res., Inc. v. Guerriero*,
   2003 WL 23112398 (D. Mass. Dec. 30, 2003) ....................................................................21, 23

*Research & Trading Corp. v. Pfuhl*,
   1992 WL 345465 (Del. Ch. Nov. 18, 1992)................................................................................14

*Sierra Club v. Larson*,
   769 F. Supp. 420 (D. Mass. 1991)..............................................................................................20

*SimpliVity Corp. v. Moran*,
   2016 WL 5122671 (Mass. Super. Aug. 14, 2016)..........................................................18, 21, 24

*T.H. Glennon Co., Inc. v. Monday*,
   2020 WL 1270970 (D. Mass. Mar. 17, 2020) ............................................................................11

*TP Grp.-CI, Inc. v. Vetecnik*,
   2016 WL 5864030 (D. Del. Oct. 6, 2016) ..................................................................................14

*Tuckerbrook Alt. Invs., LP v. Banerjee*,
   2008 WL 2356349 (D. Mass. June 4, 2008)...............................................................................22

*Viken Detection Corp. v. Videray Techs. Inc.*,
   2020 WL 68244 (D. Mass. Jan. 7, 2020) ......................................................................................7

*Wash. Trust Advisors, Inc. v. Arnold*,
   646 F. Supp. 3d 210 (D. Mass. 2022) ...........................................................................................3

**Statutes**

18 U.S.C. § 1839(3) .................................................................................................................4

18 U.S.C § 1839(6)(A) ............................................................................................................8

Massachusetts Noncompete Agreement Act, Mass. Gen. Laws ch. 149, § 24L...........................12, 13

## PRELIMINARY STATEMENT

BioAgilytix brings this Motion for a Temporary Restraining Order and Preliminary Injunction to stem the irreparable harm caused by McNally's misappropriation of trade secrets, and breach of his non-compete, customer non-solicitation, non-disclosure, and return-of-documents obligations. The harm to BioAgilytix in not issuing this preliminary relief is staggering, while the harm to McNally is none at all, given that he was rewarded over $2.9 million in exchange for his restrictive covenants. Indeed, a failure to award preliminary relief would gift McNally a windfall at BioAgilytix's expense.

For five years, McNally led BioAgilytix as its Chief Scientific Officer. In that role, he reported directly to the Chief Executive Officer, prepared for and attended each quarterly meeting of BioAgilytix's multi-national board of directors, was the executive sponsor for many of BioAgilytix's largest client accounts, and was intrinsically involved with each. Two years into McNally's tenure, he was an active participant and officer influencing the decision to sell the company. In exchange for acceptance of one-year, post-employment non-compete and non-solicit restrictions, McNally received over $2.9 million in sale proceeds. Three years later, McNally breached his contractual obligations. Behind his misconduct is Sword Bio, who induced theses breaches.

BioAgilytix and Sword Bio are direct competitors in the market for the assay development, validation, and sample analysis used by pharmaceutical and biotechnology companies in drug and biotech research and development. BioAgilytix is a global contract research organization ("CRO") founded in 1996. Sword Bio, founded in 2005 by a former BioAgilytix employee, holds itself out as a "faster, cheaper" BioAgilytix. This lawsuit arises from Sword Bio's attempt to undercut BioAgilytix's contract bids, avoid incurring years' worth of research-and-development costs, and otherwise unfairly compete with BioAgilytix by benefiting from its extremely sensitive and valuable trade secrets.

On January 24, 2025, McNally announced his resignation from BioAgilytix, with his last day on February 7, 2025. In the days leading up to his resignation, McNally accessed, downloaded, or

printed highly sensitive files without any legitimate business purpose for having done so. He accessed his Google Drive. And he connected to three remote personal computers *hundreds* of times.

In his exit interview, McNally spoke with Rebecca New, BioAgilytix's Chief People Officer, and confirmed that he was bound by a non-compete. Indeed, McNally bragged at that meeting that he was a direct decision maker in the sale, and an advocate for the deal. Nonetheless, within a month, McNally appeared prominently at a major biopharmaceutical conference in Cambridge, Massachusetts, on Sword Bio's behalf and visited at least one of BioAgilytix's clients at its offices.

In light of the foregoing, BioAgilytix's request is straightforward and well within what it is entitled to under the law. Until a final disposition on the merits, BioAgilytix is entitled to an order directing McNally to undergo a forensic remediation of his computing devices and accounts, restraining and enjoining McNally from competing with BioAgilytix, soliciting its customers, and using or disclosing its trade secrets and other confidential information.

## STATEMENT OF FACTS

BioAgilytix respectfully refers the Court to the Verified Complaint filed on April 29, 2025, as well as the Declarations of Rebecca New, Linda Robbie, A. Cuyler Robinson, and Miguel A. Lopez (and exhibits attached thereto), for the full record of facts supporting BioAgilytix's Motion, which are incorporated by reference herein.

## LEGAL STANDARD

To obtain a temporary restraining order ("TRO"), the plaintiff must establish four elements: "(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the [TRO] is withheld, (3) a favorable balance of the hardships, and (4) a fit (or lack of friction) between the [TRO] and the public interest." *Wash. Trust. Advisors, Inc. v. Arnold,* 646 F. Supp. 3d 210, 217 (D. Mass. 2022).

3

## ARGUMENT

I.  **BIOAGILYTIX IS LIKELY TO SUCCEED ON THE MERITS OF ITS DTSA AND MUTSA CLAIMS[1]**

### A.    The Information at Issue is a Trade Secret

The BioAgilytix files that McNally accessed, downloaded, or printed during his Notice Period constitute trade secrets within the meaning of the DTSA. The DTSA defines "trade secret" to include "all forms and types of financial, business, scientific, technical, economic, or engineering information" so long as (i) the owner "has taken reasonable measures to keep such information secret" and (ii) "the information derives independent economic value, actual or potential, from' its secrecy." *See* 18 U.S.C. § 1839(3). "The DTSA and MUTSA overlap in their definitions of trade secrets." *DraftKings Inc. v. Hermalyn*, 732 F. Supp. 3d 84, 110 (D. Mass.), *aff'd*, 118 F.4th 416 (1st Cir. 2024).

The trade secrets at issue in this Motion fall into three categories:

**Technical Trade Secrets:** This category includes confidential information about the research and development of BioAgilytix's assays, immunogenicity platforms, and biomarkers. The information combines proprietary research, formulas, and designs with clients' feedback and specifications, which are in turn protected by nondisclosure agreements. Examples of Technical Trade Secrets at issue here are described at length in the Declaration of Linda Robbie ("Robbie Decl.") ¶¶ 41-64.

**Client Information Trade Secrets.** This category includes compilations of confidential client information developed by teams over lengthy periods of times. This information includes: detailed information regarding meetings between clients and BioAgilytix's scientific officers and various categories of client preferences, including a list of 83 target clients with detailed plans and contact

---

[1] For the reasons stated in this Section I(A), BioAgilytix is also likely to succeed in its claim that McNally breached the non-disclosure provisions in Section 3(a) of the Employment Agreement and 4(a) of the Support Agreement, and the return-of-documents provision in Section 7 of the Employment Agreement.

information and lists with customer visit information. Examples of Client Information Trade Secrets at issue here are described at length in Declaration of Linda Robbie ("Robbie Decl.") ¶¶ 65-75.

**Corporate Strategy Trade Secrets**. This category includes confidential information documents concerning BioAgilytix's annual budgets, strategic accounts, operational updates, equipment investments, critical project updates, IT strategy roadmap, organizational risk assessment, customer drug approvals, employee training strategy, operations roadmaps, comprehensive RFP templates, and specific target strategies. Examples of Corporate Strategy Trade Secrets at here are described at length in Declaration of Linda Robbie ("Robbie Decl.") ¶¶ 76-94.

### 1. BioAgilytix Took Reasonable Measures to Protect Its Trade Secrets

BioAgilytix took reasonable measures to keep the information secret. In analyzing whether a party took proper steps to protect its trade secrets, "the standard is reasonableness, not perfection." *Optos, Inc. v. Topcon Med. Sys.*, 777 F. Supp. 2d 217, 240 (D. Mass 2011). Four factors guide this inquiry: (1) the existence of a confidentiality agreement, (2) the nature and extent of precautions taken, (3) the circumstances under which the information was disclosed, and (4) the degree to which the information has been in the public domain or rendered ascertainable. *Id.* at 240. Each factor supports the conclusion that BioAgilytix made more than reasonable efforts to protect its trade secrets.

*First*, BioAgilytix required McNally, as a condition of his employment, to sign an Employment Agreement that contained a non-disclosure provision and a provision that he may only access BioAgilytix data in connection with his employment, in accordance with policy, "and solely for the Company's benefit." *See* New Decl. ¶ 2; Ex. A § 3(a), (c). The Employment Agreement also contained a provision requiring him to return all BioAgilytix documents at the end of his employment and to submit to a third-party forensic inspection upon request (the "Return-of-Documents" provision). *See id.* § 7. He then reaffirmed his non-disclosure obligations in Section 4(a) of the Support Agreement.

*Second*, BioAgilytix takes extensive precautions to safeguard its trade secrets, including by: (1) restricting access to its systems to individuals who have entered a password and completed a two-step authentication process; (2) maintaining policies prohibiting employees from storing BioAgilytix information on a non-network storage devices or IT networks not under BioAgilytix's control; and (3) maintaining policies requiring that employees only access BioAgilytix's networks and confidential for work purposes. Compl., ¶ 94; *See* New Decl. ¶ 33; Ex. G at 9; Ex. H at 2-3.

*Third*, the disclosure in this case did not result from any lapse in BioAgilytix's data protection safeguards, but rather from McNally's abuse of the privileges entrusted to him by BioAgilytix. McNally was allowed to retain access to BioAgilytix's systems during his two-week notice period in case he needed to transition any work, but he had no no reason to access the trade secrets at issue here during this time period. New Decl. ¶ 27. To the extent that he exfiltrated the trade secrets through use remote desktop connections and his personal Google Drive account, as suggested by the forensic analysis to date, *see* Robinson Decl. ¶¶ 14-21, he did so in breach of his obligations and of Company policy, as discussed in greater detail in Section I(B), *infra*.

*Finally*, the trade secrets are not publicly ascertainable. Compl., ¶ 94; Robbie Decl. ¶¶ 41-93. The Technical Trade Secrets, along with other non-public information, were subject to third-party non-disclosure agreements. *See* Robbie Decl. ¶ 64. The Client Information Trade secrets, while containing certain elements that may be publicly known, such as contact information, are composite work product that are not publicly known or easily replicated. *See EMC Corp. v. Pure Storage, Inc.*, 2016 WL 7826662, at *6 (D. Mass. Aug. 19, 2016) ("The fact that individual aspects of the 'lists' may be public does not prevent the entire compilation from being a trade secret.").

### 2.  The Trade Secrets Derive Value from Their Secrecy

The Trade Secrets derive independent economic value from their secrecy. The Technical Trade Secrets contain "information undisclosed to the public, such as information regarding the

iterative development process, alternative or incorrect solutions and developmental 'dead ends'" which would provide a competitor "with an unfair advantage in developing a competing complex product." *Viken Detection Corp. v. Videray Techs. Inc.*, 2020 WL 68244, at *5 (D. Mass. Jan. 7, 2020). If Sword Bio were to possess this information, it could expedite the process to develop competing products and meet customers' preferred specifications, thereby diminishing BioAgilytix's competitive advantage. *See* Robbie Decl. ¶¶ 41-64.

The same is true of the Client Information Trade Secrets. Courts routinely afford this class of information trade secret protection. *See, e.g., Allstate Ins. Co. v. Fougere*, 79 F. 4th 172, 190-191 (1st Cir. 2023) (concluding that spreadsheet with customers names and information was a trade secret); *FrontRunner HC, Inc. v. Waveland RCM, LLC*, 2020 WL 7321161, at * 9 (D. Mass. Dec. 11, 2020) ("Customer lists, contracts and bid documents give [the plaintiff] a competitive advantage that is not possessed by its competitors."). These documents are valuable to BioAgilytix because they provide a tailored guide on how to best serve the client's needs. *See* Robbie Decl. ¶¶ 65-75. If Sword Bio were to possess these documents it could target cater to these customers using information developed through years of customer relations, diminishing BioAgilytix's competitive advantage. *See Id.* .

Finally, the Corporate Strategy Trade Secrets are likewise valuable because of their secrecy. *See* Robbie Decl. ¶¶ 76-94. This information was created through the time-intensive efforts of dedicated teams within BioAgilytix. *Id.* ¶ 94. They included data that was not publicly available, including price and cost information, and laboratory results. *Id.* ¶¶ 76-94, 100. These documents have BioAgilytix's business roadmap, including information about BioAgilytix's five-year Strategic Plan. *Id.* ¶¶ 76-94. If left in the hands of Sword Bio, the documents would lose value to BioAgilytix as Sword Bio could replicate BioAgilytix's processes and strategy or exploit perceived weak spots in BioAgilytix's plans. *See Draftkings*, 732 F. Supp. 3d at 116 ("DraftKings derives economic value from keeping the

information in these documents—information about its business strategies and compilations of its business partners and VIP relationships—secret from its competitors.").

### B.    McNally Used Improper Means to Acquire the Trade Secrets

BioAgilytix is likely to prove that McNally used improper means to acquire BioAgilytix's trade secrets. Improper means include misrepresentation or a breach of the "duty to maintain secrecy." 18 U.S.C § 1839(6)(A); *see also G&L Plumbing, Inc. v. Kibbe,* 699 F. Supp. 3d 96, 107 (D. Mass 2023) (explaining that the MUTSA and DTSA "contain[n] very similar language."). McNally misappropriated BioAgilytix's trade secrets through improper means insofar as he: (1) impermissibly retained the trade secrets, in breach of Sections 3 and 7 of his Employment Agreement; (2) breached written policy by storing trade secret material on unauthorized storage media and on authorized cloud-storage accounts; and (3) accessed, downloaded, and likely printed the trade secrets without any legitimate business reason for doing so and in the context of his impending competition at Sword Bio.

### 1.    Breach of McNally's Contractual Provisions

It is settled law that "a former employee who breaches his contractual obligations to obtain trade secrets, as a matter of law, used improper means." *DraftKings Inc.,* 732 F. Supp. 3d at 119. Here, McNally breached the Return-of-Documents Provision at Section 7 of the Employment Agreement, and the information access restrictions in Section 3(c) of the Employment Agreement.

*First*, it is indisputable that McNally improperly retained and failed to promptly return at the end of his employment three laboratory notebooks and six USB devices that he plugged into his BioAgilytix computer – including one device on which he saved a presentation with BioAgilytix's strategy on advanced therapy medicinal products. . *See* Declaration of Cuyler Robinson ("Robinson Decl.") ¶ 11; Robbie Decl. ¶¶ 34-37. This was a breach of the Return-of-Documents Provision, and it constitutes acquisition by improper means whether or not it was inadvertent. *See Boston Scientific Corp. v. Lee,* 2014 WL 1946687, at *5 (D. Mass. May 14, 2014) (holding that defendants' inadvertent retention

of documents was still improper means where defendant was under obligation to return confidential information upon his termination).

Indeed, courts find unauthorized retention of trade secrets to constitute improper means of possession irrespective of a contractual obligation to return documents. In *FrontRunner*, 2020 WL 7321161, the court held that the allegedly inadvertent nature of the individual defendant's retention of confidential and proprietary information on a USB "does not limit his liability." *See id.* at *11. In *Allstate Ins. Co. v. Fougere*, 79 F.4th 172 (1st Cir. 2023), the First Circuit affirmed a finding of misappropriation, finding that the presence of trade secrets where they should not be constitutes misappropriation: "Most damning is the undisputed fact that the spreadsheets found on ABIA's computer contained information, . . . which the EA agreements unquestionably designated as confidential, and which constitute trade secrets owned by Allstate." *Allstate Ins. Co.*, 79 F.4th at 195.

*Second,* he breached Section 3(c) of the Employment Agreement, which provides: "Employee will not . . . access . . . any Company computer systems, . . . data that resides thereon, except as such access is authorized and required in connection with his/her employment and only then in accordance with applicable Company policies and procedures **and solely for the Company's benefit**." *See* New Decl. ¶ 2; Ex. A, § 3(c) (emphasis added). As discussed in greater detail in Complaint ¶¶ 55-75, McNally accessed several files that he had no business reason to access *after* giving his notice of resignation and being asked to stand down from all substantive work. This access included the downloading of the following files onto his BioAgilytix laptop:

a.    The "Master Deck" for a specific client, dated May 2024, containing detailed confidential information about one of BioAgilytix's largest biopharmaceutical clients.

b.    <u>Immunogenicity Overview</u>: A document containing fifteen slides that discuss in confidential detail BioAgilytix's immunogenicity assessment strategy.

c.    <u>Town Hall (July 2024) – Approval Slides.pptx</u>: A document with ten slides containing confidential information about clients' drug approvals resulting from research supported by BioAgilytix.

d.    BioAgilytix General Capabilities – [Client] JAN2025.pptx: A document with over eighty slides of information regarding the instruments and techniques BioAgilytix uses with a specific client for assay and immunogenicity platforms and biomarkers.

e.    February 2025 Board meeting presentation: This document, which McNally accessed repeatedly during his notice period, contains high-level discussions of audits and past performance in support of customers' clinical trials. Critically, the February 2025 board presentation includes BioAgilytix's five-year Strategic Plan, and its results through Year Two. The presentation also contains customer pipeline information, information regarding equipment investments, and company financials and risk assessments.

f.    Client ADC Overview and Case Studies: This document provides unpublished, confidential case studies and test results of assays not currently offered for off-the-shelf use in the market. ADC stands for "antibody-drug conjugates," a major commercial area for BioAgilytix. These client-specific case studies reveal the client's confidential equipment specification preferences and would allow a competitor to tailor its offerings to that client's preferences.

Compl. ¶ 57. During the same period, McNally remotely accessed three personal computers, logged onto his Google Drive, used his Gmail account, and interacted with a home printer. *See* Section I(B)(2), *infra*. It is therefore likely that BioAgilytix will succeed in showing that McNally transferred at least some of these downloaded files to non-BioAgilytix environments and improperly retained them.

## 2.    Breach of the Media Protection Policy

BioAgilytix is also likely to establish McNally's acquisition by improper means through his storage of BioAgilytix trade secrets on unauthorized USB devices. McNally had a file containing trade secret material on an unauthorized USB (PNY 128 GB). Robinson Decl. ¶ 11; Robbie Decl. ¶¶ 34-35. This is a breach of the Media Protection Policy, which prohibits user "from storing BAL information on any non-network storage device or media." New Decl. ¶ 34; Ex. H at 2-3. BioAgilytix's forensic analysis to date also suggests McNally was using Google Drive to exfiltrate BioAgilytix trade secret material. Although there is no way of having full visibility into his Google Drive account without gaining access to it, we do know that he viewed a file named "[CLIENT] PRE ITC and ITC Notes" from his Google Drive on his BioAgilytix computer. Robinson Decl. ¶ 18. This file contains trade secret material concerning notes that he took during a call concerning one of BioAgilytix's clients.

Robbie Decl. ¶ 37. McNally was prohibited "from storing BAL information on IT systems that are not under direct control or contractual control of BAL. New Decl. ¶ 33; Ex. G at 2-3.

### 3.    Access without any legitimate business reason

Courts will also find evidence of acquisition by improper means when the context suggests that the defendant accessed the trade secret material without a legitimate reason for doing so. This, even when doing so is not a contractual or policy breach. For example, in *DraftKings*, the court found that acquisition by improper means based on evidence that the defendant "downloaded these documents after he had decided to accept the new job at [competitor] and while he was, as he admits, avoiding [his employer's] meetings." 732 F. Supp. at 84. Here, McNally accessed, downloaded, and possibly printed trade secret material *after* he had received an offer from Sword Bio, *after* his notice of resignation to BioAgilytix, and *after* BioAgilytix's CEO and Chief People Officer had each relieved him of nearly all of his duties. *Compare* New Decl. ¶¶ 22-23, *with* Robinson Decl. ¶ 22.

In finding that McNally accessed these trade secrets without any legitimate business reason, this Court can also rely on evidence that McNally sought to cover his tracks. Following a bench trial, the court in *T.H. Glennon Co., Inc. v. Monday*, 2020 WL 1270970 (D. Mass. Mar. 17, 2020) found acquisition by improper means based, in part, on "evidence that [the defendant] was both intentional in accessing the database, and intentionally deleting files to cover his tracks." *Id.* at *16. In his final week of work, McNally ran Google searches for "does clean install wipe all drives or just the windows drive," and for "does reset this pc reinstall windows." *See id.* ¶ 35.

McNally's increased use of a remote desktop connection from his BioAgilytix computer during the Notice Period is further evidence of acquisition by improper means. McNally visited Google Remote Desktop hundreds of times from his BioAgilytix computer. *See id.* ¶ 20. During this time, McNally's BioAgilytix computer connected to three remote computers named "McNallyDesktop," "Old Yeller Computer", and "McNallyNAS". *See id.* ¶ 20. The most recent connections to the

McNallyDesktop and McNallyNAS from McNally's BioAgilytix computers to these personal computers was on his final day, February 7, 2025. *See id.* Of course, saving trade secret files to personal computers by unauthorized means would also be a breach of contract and of company policy. New Decl. ¶ 34; Ex. H at 2-3. McNally still had access to his BioAgilytix computer at this time; there was no reason for him to be accessing BioAgilytix documents remotely. New Decl. ¶ 25. This evidence of improper means is similar to that in *DraftKings*, in which the defendant used "an unauthorized method . . . to transfer to himself documents containing DraftKings's trade secrets." *See DraftKings, Inc.*, 732 F. Supp. 3d at 118. Given these separate and overlapping bases for finding improper means of acquisition in this case, BioAgilytix has more than demonstrated a likelihood of success in establishing McNally's misappropriation of trade secrets.

## II.   BIOAGILYTIX IS LIKELY TO SUCCEED ON THE MERITS OF ITS CONTRACT CLAIMS

### A.   The Non-Compete Provision is Enforceable under Massachusetts and Delaware Law

The Non-Compete Provision in McNally's Support Agreement, while governed by Delaware Law, also meets the requirements of the Massachusetts Noncompete Agreement Act ("MNAA"), Mass. Gen. Laws ch. 149, § 24L. The Support Agreement is in writing, *see id.* § 24L(b)(i), supported by consideration distinct from continued employment, *id.* § 24L(b)(ii), encourages employees to consult with counsel, *id.*, does not exceed a period of 12 months after employment, *id.* § 24L(b)(iv), and has "mutually-agreed upon consideration," in lieu of a "garden clause" as permitted by the MNAA, *id.* § 24L(b)(vii). Here, the "mutually-agreed upon consideration" is the $1.55 million in cash and $1.4 million in Rollover Securities awarded to McNally in consideration for his acceptance of the Support Agreement. *See* New Decl. ¶ 18; *DraftKings*, 732 F. Supp. 3d at 110 (finding that "multimillion-dollar equity grants" satisfied enforceability requirement); *Cynosure LLC v. Reveal Lasers LLC*, 2022 WL

18033055, at *9 (D. Mass. Nov. 9, 2022) (finding that stock options awarded under equity agreement acceptable in lieu of a "garden clause.").

The substantive analysis for enforceability under the facts of a given case is substantially similar under Delaware and Massachusetts law. *See NuVasive, Inc. v. Day*, 2019 WL 2287709, at *4 (D. Mass. May 29, 2019), *aff'd*, 954 F.3d 439 (1st Cir. 2020). Under Delaware law, a restrictive covenant, including a non-compete agreement, is enforceable if it: (1) meets general contract law requirements, (2) is reasonable in scope and duration, and (3) advances a legitimate interest of the employer. *EDIX Media Grp., Inc. v. Mahani*, 2006 WL 3742595, at *7 (Del. Ch. Dec. 12, 2006). Where, "the restrictive covenant in question was obtained as part of a contract for the sale of stock, this inquiry is less searching than if the Covenant had been contained in an employment contract." *Kan-Di-Ki, LLC v. Suer*, 2015 WL 4503210, at *19 (Del. Ch. July 22, 2015) (internal quotation marks omitted). The Non-Compete Provision provides that, for a period of 12 months following his employment:

> Restricted Party [McNally] shall not. . . be employed by . . . any Competing Business (as defined below) within the United States, Australia, Europe, or any other jurisdiction or marketing area in which any Business Entity is doing business. . . . . Notwithstanding the foregoing, (i) Restricted Party may be employed by and provide services to a Person that engages in multiple lines of business (including the Business) so long as (x) Restricted Party is not employed by or provide any services or assistance to the line of business that engages in the Business, (y) Restricted Party complies with Restricted Party's other obligations under this Agreement and (z) the annual revenues of such Person from the Business are not more than five percent (5%) of such Person's total consolidated annual sales (based on the most recent full fiscal year revenues of such Person . . . .

New Decl., ¶ 18; Ex. B § 6. Because the Support Agreement meets the MNAA requirements, it necessarily meets general contract law requirements. We address the remaining elements below.[2]

---

[2] Some courts treat the balancing of the equities to be a separate element in the test for enforceability of a restrictive covenant. The balancing of the equities here favors BioAgilytix, as discussed in the harms-balancing analysis undertaken under the preliminary injunction standard. *See* Section V, *infra*.

### 1.    The Non-Compete Provision is Reasonable in Time and Space

The Non-Compete Provision has a duration of one year from the end of McNally's employment. New Decl., ¶ 18; Ex. B § 6. The one-year duration is reasonable under Delaware and Massachusetts law, as courts regularly enforce covenants with restrictive periods of one year or more. *See TP Grp.-CI, Inc. v. Vetecnik*, 2016 WL 5864030, at \*2 (D. Del. Oct. 6, 2016) (explaining that Delaware courts have enforced covenants of two years or more); *A.R.S. Servs. v. Morse*, 2013 WL 2152181, at \* 11 (Mass. Super. April 5, 2013) (finding one-year restriction to be reasonable).

The geographic scope is also reasonable. In Delaware, "the reasonableness of a covenant's scope is not determined by reference to physical distances, but by reference to the area in which a covenantee has an interest the covenants are designed to protect." *O'Leary v. Telecom Res. Serv., LLC*, 2011 WL 379300, at \*5 (Del. Super. Ct. Jan. 14, 2011). Delaware law condones broad geographic restrictions, up to and including non-competes with a global scope when the relevant competitive market is equally broad or global. *See Avaya, Inc. v. Ali*, 2012 WL 2888474, at \*7 (D. Mass. July 13, 2012) (applying Delaware law); *see also Research & Trading Corp. v. Pfuhl*,1992 WL 345465, at \*12 (Del. Ch. Nov. 18, 1992) (enforcing a non-competition agreement with "no geographic limitation" because the employer's customer base extended internationally). Massachusetts law is in accordance with Delaware law in this respect. *See Nuance Commc'ns, Inc. v. Kovalenko*, 2022 WL 237112, at \* 6 (D. Mass. June 29, 2022) (enforcing restrictive covenant with no geographic limitation because employee's responsibilities were not geographically limited); *EMC Corp. v. Allen*, 1997 WL 1366836, at \*1 (Mass. Super. Ct. Dec. 15, 1997) (worldwide restriction reasonable where responsibilities are worldwide).

Here, the geographic scope of the Non-Compete Provision is "the United States, Australia, Europe, or any other jurisdiction or marketing area in which any Business Entity is doing Business." New Decl. ¶ 18; Ex. B ¶ 6. This scope is reasonable because BioAgilytix has laboratories in the United States (North Carolina, Massachusetts, and California), Australia (Brisbane and Melbourne), and

14

Europe (Germany). Robbie Decl. ¶ 4. BioAgilytix provides services to pharmaceutical and biotech companies worldwide. *Id.* ¶ 2. As the Chief Scientific Officer and member of the executive team, McNally was responsible for BioAgilytix strategy across the world, regularly visited each of its six laboratories, and traveled to Europe for its Board meetings. New Decl. ¶ 8. Moreover, the Support Agreement was executed in connection with a multinational corporate acquisition. *See id.* ¶ 18. Because the scope set forth in the Non-Compete Provision is tailored to McNally's actual business activity and to the economic realities of the Support Agreement it should be enforced as written.

### 2. The Non-Compete Provision Advances BioAgilytix's Legitimate Interests

The Non-Compete Provision advances BioAgilytix's legitimate interests. "Legitimate interests" recognized by Delaware law include protection of employer goodwill, and protection of employer confidential information from misuse. *Kan-Di-Ki,* 2015 WL 4503210, at *20; *accord Found. Med., Inc. v. Kittle,* 2025 WL 563067, at *1 (D. Mass. Feb. 20, 2025). Here, the Non-Compete Provision advances – and is necessary for the protection – of both these interests. In signing the Support Agreement, McNally acknowledged that the "primary purpose of the Merger Agreement is for the Buyer to acquire the business, goodwill and assets of the Company and its Subsidiaries," *i.e.,* BioAgilytix, *see* New Decl. ¶ 18; Ex. B, Recitals, and that – by accepting the Support Agreement – McNally would "receive substantial direct and indirect benefits by the consummation of the transactions contemplated by the Merger Agreement." *Id.* Specifically, McNally stood to receive $1.55 million in an equity cash-out and $1.4 million in securities. *See* New Decl. ¶ 19. The Non-Compete Provision protects that interest, and contains exclusions for roles with a company that might compete to a limited extent with BioAgilytix. Buyer assigned the Support Agreement to BioAgilytix specifically so that BioAgilytix could protect Buyer's benefit of the bargain in the Merger Agreement. *See* New Decl. ¶ 20; Ex. D, Recitals.

McNally was directly involved in Cinven's acquisition of BioAgilytix, and an advocate for the deal. *See* New Decl. ¶ 18. The Company was valued in large part on the strength of the scientific offerings and related goodwill that he had helped develop and that he would continue to develop post-acquisition. *See Id.* ¶ 15. Enforcement of the Non-Compete Provision is necessary to protect that goodwill. BioAgilytix "acted reasonably and legitimately in insisting on some measure of protection from the possibility that [McNally] simply would . . . undermine [its] business to [McNally]'s benefit by using information he gained during his involvement with the business[]." *Kan-Di-Ki, LLC*, 2015 WL 4503210, at *20.

Following the sale of the business, McNally continued to be the executive sponsor for many of BioAgilytix's largest, most important client accounts, was actively involved with nearly all other accounts, and had access to confidential information concerning every single account. New Decl. ¶ 7. He regularly participated in discussions regarding sensitive customer information and knows BioAgilytix's customers' needs and preferences. *Id.* ¶ 12. Critically, McNally formed these relationships with BioAgilytix because of his employment with BioAgilytix. *Id.* ¶¶ 12-14. The goodwill, therefore, belongs to BioAgilytix, not McNally. *See Lombard Med. Tech., Inc. v. Johannessen*, 729 F. Supp. 2d 432, 439 (D. Mass. 2010) ("When the employer introduces the client to the [employee] or the [employee] cultivated his relationship with the client while employed by the employer, the good will belongs to the employer.") (internal quotation marks omitted).

Beyond confidential customer account information, McNally was also privy to – and indeed was instrumental in developing – BioAgilytix's corporate strategy in the United States as well as in Europe and Australia. New Decl. ¶ 8. He attended every Board of Directors meeting, and helped prepare for and present at those meetings. *Id.* ¶ 6. McNally was the co-author and executive sponsor of the Strategic Plan, which detailed BioAgilytix's specific initiatives for each year from 2025 through 2029. Robbie Decl. ¶ 6. The Strategic Plan also included a five-year financial mode that included a

forecast for market growth, a five-year win rate and revenue model, a five-year capital expenditure breakdown, and other information that would give a competitor such as Sword Bio a competitive advantage in the market at the expense of BioAgilytix's painstaking planning. *Id.* ¶ 6.

McNally was also the executive sponsor for two proprietary initiatives: the Chemistry, Manufacturing, and Controls ("CMC") project, which is a drug-development and manufacturing process that incorporates sequential testing for the life cycle of a drug candidate; and the Lab Automation initiative, an integrated lab execution system to track and maintain lab equipment, reagents, and samples and generate reports for workflow. *Id.* ¶¶ 9-13. Sword Bio does not have these offerings, and McNally's guidance in developing these initiatives at Sword Bio would allow that competitor to avoid incurring the time and expense that comes with organic development. *Id.* ¶¶ 12, 14. The Strategic Plan, including the CMC project and Lab Automatic initiative, were presented the Board on October 15, 2024. *Id.* ¶ 15. McNally helped created the 192 slides detailing these initiatives, assisted with its presentation, and was present for the ensuing Board discussion. *Id.*

The Non-Compete Provision is necessary for the protection of BioAgilytix's legitimate interest in preventing competitors like Sword Bio from taking advantage of McNally's current, executive-level corporate knowledge. The lesser restrictions to which McNally agreed would not suffice, given the circumstances of this case. Recently, Judge Stearns came to the same conclusion with respect to an employee who also worked at a biotechnology company and who ranked lower at his company than McNally did at BioAgilytix. Judge Stearns reasoned:

> Although Kittle suggests that this business interest is adequately protected by the admittedly binding confidentiality and non-solicitation provisions of his contract, the court, while not questioning the purity of Kittle's intentions, is not convinced. An employee "does not go with *tabula rasa* with respect to [the former employer's] products, its development strategies, its marketing plans, its customers and other significant business information. Indeed, "[i]t is difficult to conceive how all of the information stored in [the former employee's] memory can be set aside as he applies himself to a competitor's business and its products."

*Found. Med., Inc. v. Kittle*, 2025 WL 563067, at *1 n.2 (D. Mass. Feb. 20, 2025) (internal citations omitted) (quoting *Cynosure*, 2022 WL 18033055, at *12); *see also SimpliVity Corp. v. Moran*, 2016 WL 5122671, at *12 (Mass. Super. Aug. 14, 2016) ("Moreover, as discussed above, even with his best efforts, Moran will inevitably use the SimpliVity confidential information in his brain and memory in selling Nutanix's products and competing against SimpliVity."). This court should join the courts in *Foundation Medicine*, *Cynosure*, and *SympliVity Corp.*, in finding that a non-compete provision such as the one that McNally agreed to (in exchange for millions of dollars), advances the employer's legitimate need and should be enforced notwithstanding the existence of lesser restrictions.

Finally, as a biotechnology company at the cutting-edge of research-and-development tools, BioAgilytix's trade secrets and other confidential information are among its most valuable assets, and the Non-Compete Provision advances that interest as well. Robbie Decl. ¶ 101. As explained in Section I(A), *supra*, McNally's employment at Sword Bio threatens that interest, and enforcement of the Non-Compete Provision is necessary for its protection. All of this would be true even in the absence of the evidence marshalled by BioAgilytix of McNally's exfiltration of BioAgilytix trade secrets and suspicious computer activity.

**B.    The Non-Solicitation Provisions are Enforceable Under Delaware and Massachusetts Law**

McNally is subject to non-solicitation provisions under Section 5 of the Support Agreement, which is governed by Delaware law, and under Section 6(a) of his Employment Agreement, which is governed by Massachusetts law (collectively, the "Non-Solicitation Provisions"). As less-restrictive covenants than the Non-Competition Provision, the Non-Solicitation Provisions meet all of the enforcement standard discussed in Section II(A), *supra*. The Non-Solicitation Provisions have the same duration and geographic scope as the Non-Compete and advance many of the same interests, albeit fewer, given their less comprehensive protection.

### C.    McNally Is in Breach of His Non-Compete and Non-Solicitation Provisions

McNally cannot credibly dispute that he is in breach of the Non-Compete Provision. He is working for BioAgilytix's direct competitor in the same role that he occupied at BioAgilytix. Robbie Decl. ¶¶ 16-21. He is also in breach of his Non-Solicitation Provisions. In Section 6(a) of the Employment Agreement, McNally agreed, for a period of 12 months following the end of his employment, not to:

> call on, solicit or attempt to solicit any customer of the Company that the Employee contacted or engaged in business with on behalf of the Company during the term of [his/her] employment, **or provide material assistance or support to any third party to do so** . . . .

New Decl. ¶ 2; Ex. A § 6(a) (emphasis added). And in the Support Agreement, he agreed, for a period of 12 months following the end of his employment, not to, in pertinent part:

> Solicit or induce any Client of [BioAgilytix] to purchase from a Competing Business services pertaining to the Business in competition with any Business Entity, **or knowingly aid any Competing Business in soliciting any such Client**.

*Id.* § 5(b) (emphasis added) (emphasis).

McNally may dispute that he is now in a client-facing role, but Sword Bio's social media activity belies that position and confirms that he has already violated both Non-Solicitation Provisions. McNally presented himself as an expert in bioanalysis on behalf of Sword Bio at Workshops on Recent Issues in Bioanalysis ("WRIB 2025"), a major conference that took place in New Orleans, Louisiana, from April 7 through 11, 2025. Robbie Decl. ¶ 30. Sword Bio posted on LinkedIn, "Please take the opportunity to touch base with <u>Jim McNally</u> and <u>Seth Reid</u> at booth #79 or arrange a meeting to learn how Sword Bio can assist with your bioanalytical projects." *See id.* ¶ 32. Seth Reid is Sword Bio's Vice President of Business Development, and, until March 2024, was a BioAgilytix employee based out of the Boston facility, just like McNally. *See id.* ¶ 27. Sword Bio's social media activities undercut any

assertion McNally is not working in a client-facing role. He has in fact already provided "material assistance" and "knowingly aided" Sword Bio in soliciting BioAgilytix's clients.

The evidence shows that Sword Bio has not only assigned client-facing duties to McNally but that McNally has attempted to solicit at least two of BioAgilytix's largest clients, including Moderna. On March 11, 2025, Mr. Reid posted on LinkedIn: "Excited to be hosting Melissa Taylor from Moderna at the CIC in Cambridge, MA for a Lunch & Learn seminar today with Jim McNally." Robbie Decl. ¶ 28. McNally also directly contacted another large client to arrange a meeting with its personnel at the client's facility. *Id.* ¶ 29. McNally's contact with these clients expressly breaches his non-solicitation contractual obligations.

As recently as April 30, 2025, Sword Bio posted on LinkedIn: "Headed to AAPS NBC next week and still looking for someone to grab coffee, breakfast, or lunch with? Look no further than Jim McNally and Seth Reid . . . . And when it's time to talk science, they're true experts in immunogenicity, PK, and biomarkers." New Decl. ¶ 37. The post was subsequently removed pursuant to the parties' standstill agreement. *See* Lopez Decl. ¶ 12. McNally will continue his solicitation if not enjoined.

## III. BIOAGILYTIX WILL SUFFER IRREPARABLE HARM ABSENT A TEMPORARY RESTRAINING ORDER

"Irreparable injury" is an injury for which money damages will not compensate. *Sierra Club v. Larson*, 769 F. Supp. 420, 422 (D. Mass. 1991). At the outset, BioAgilytix satisfies the irreparable harm element because McNally misappropriated BioAgilytix's trade secrets, as explained in Section I(B). The "[m]isappropriation of trade secrets creates a presumption of irreparable harm." *Allstate Ins. Co.*, 581 F. Supp. 3d at 318. With respect to BioAgilytix's claims for misappropriation of trade secrets and breach of his non-disclosure and return-of-documents obligations, an injunction merely ordering McNally not to disclose or use BioAgilytix information would not be sufficient to prevent irreparable harm. Indeed, in his Employment Agreement, McNally specifically agreed:

> Upon the Company's request, Employee will submit all personal computers, phones and other devices or accounts which s/he used for Company business, and identify all personal accounts and related passwords, to a third-party vendor, as may be designated by the Company, for inspection and removal of any Company-related information, including without limitation Proprietary Information.

New Decl. ¶ 2 Ex. A § 7. He cannot now argue that BioAgilytix should do without the very remedy to which he agreed he would submit voluntarily.

Even if McNally had not specifically agreed to the forensic remediation sought herein, BioAgilytix would still be entitled to it. In *Boston Centerless, Inc. v. DeSantis*, 2022 WL 16639138 (D. Mass. Nov. 2, 2022), the court found "that Defendant, on his last day of employment with the Company and without the Company's permission, emailed to his personal email accounts multiple spreadsheets containing Plaintiff's trade secrets and confidential information." *Id.* at *1. The court ordered that a third-party forensic remediation of the defendant's computing devices, external hard drives, and email accounts. *Id.* at *2. In *SimpliVity Corp. v. Moran*, the court likewise ordered a third-party forensic remediation where – as here – a preliminary forensic remediation found use of multiple external USBs and printing devices, and where, without a court-ordered analysis "[t]he forensic analyst can not [sic] determine what, if any, files [the defendant] printed from or transferred to any USB devices without examining such devices or a forensic image thereof." 2016 WL 5122671, at *6. The same remedy is required here.

A finding of irreparable harm is also triggered where the defendant has likely violated his noncompetition agreement. *DraftKings Inc.*, 732 F. Supp. 3d at 120; *see also Oxford Glob. Res., Inc. v. Guerriero*, 2003 WL 23112398, at *11 (D. Mass. Dec. 30, 2003) ("[T]he 'task of quantifying the consequences of violating a noncompetition clause is a particularly difficult and elusive one.'"). This case does not call for deviating from that rule. BioAgilytix stands to lose its market position as a result of unfair competition from McNally and Sword Bio. McNally's decision-making position at the helm of BioAgilytix gives him intimate knowledge of BioAgilytix strategy that could be use by Sword Bio

to undercut BioAgilytix and bypass years of research and development. The harm from breach of the Non-Solicitation Provisions cannot be readily ascertained, either. BioAgilytix's customer revenue is not a fixed return on a customer agreement, but a variable figure that often depends on the success of a drug candidate and commercialized product into the future. *See* New Decl. ¶ 35.

There is also a presumption of irreparable harm where a party contractually stipulates to irreparable harm. *See A.R.S. Servs.*, 2013 WL 2152181, * 14 n.7 (explaining that a contractual stipulation to irreparable harm "obviates the need for the ordinary irreparable damage analysis," and constitutes a "contractually bind provision[] that this Court is not at liberty to change or ignore"). *See Tuckerbrook Alt. Invs., LP v. Banerjee*, 2008 WL 2356349, at *11 (D. Mass. June 4, 2008) ("[Plaintiff] need not demonstrate irreparable harm as [defendant] acknowledged in the Employment Agreement that a remedy at law would be inadequate."). McNally twice stipulated that his breach of restrictive covenants would result in irreparable harm. *See* New Decl. ¶¶ 2, 18; Ex. A § 8; Ex. B, Recitals, § 4. Given the foregoing, there is irreparable harm sufficient to warrant the TRO requested.

Finally, there has been no undue delay in seeking this relief. BioAgilytix first learned that McNally was employed by Sword Bio via LinkedIn, on March 3, 2025. *See* Robbie Decl. ¶ 22. On March 10th, prior counsel sent McNally a cease-and-desist letter. Lopez Decl. ¶ 2. On March 18th, prior counsel and counsel for McNally had a meet-and-confer, and on March 23rd, prior counsel received three laboratory notebooks and three USBs from McNally. *Id.* ¶¶ 4-5. This firm was retained on April 8th. *Id.* ¶ 6. On April 16th, BioAgilytix retained a forensic analysis firm to analyze McNally's USBs, BioAgilytix computer, and his computer activity. *Id.* ¶ 7. On April 29th, BioAgilytix filed its Complaint. *Id.* ¶ 8. From April 29th to May 2nd, the parties engaged in discussions that resulted in a standstill agreement, whereby Defendants agreed not to use the lapse in time following April 29th as a defense to injunctive relief. *Id.* ¶¶ 9-12. From May 6th through May 8th, the parties continued discussions but ultimately remained too far apart in their respective positions. *Id.* ¶¶ 13-14.

There has been absolutely no lack of urgency on BioAgilytix's part. When considering delay in seeking injunctive relief, the relevant time period begins with the discovery of the wrong (here, March 3rd) and will not be considered delay if the parties undertook efforts to resolve the dispute without the need for litigation. *See New England Controls, Inc. v. Pilsbury*, 2018 WL 3150223, at *8 (D. Mass. June 27, 2018) (finding that a 56-day "delay" was neither excessive nor unexplained). Moreover, the less than two months that elapsed between May 3rd and April 29th were "not unreasonable in order to bring a well-founded motion for a preliminary injunction." *Oxford Glob. Res.*, 2003 WL 23112398, at *11 (finding that three-month lapse between discovery and preliminary injunction motion did undermine showing of irreparable harm); *see also Grimes & Co., Inc. v. Carlson*, 2024 WL 5110193, at *8 (D. Mass. Dec. 12, 2024) (finding that two-month lapse between complaint and motion was not excessive, in light of activity in furtherance of claim).

## IV.    THE BALANCE OF THE HARMS WEIGH IN FAVOR OF GRANTING THE TRO

The balance of the harms weigh decidedly in BioAgilytix's favor. BioAgilytix merely asks that McNally be restrained from engaging in the conduct in which he agreed not to engage. Absent this relief, BioAgilytix faces the threat of losing goodwill, market position, trade secrets, confidential information, and ultimately customers. The potential harm to BioAgilytix outweighs any harm to McNally. In exchange for McNally's acceptance of the Non-Compete Provision and other restrictions in the Support Agreement, McNally received over $1.55 million in cash – over four times total compensation in 2024 – and an additional $1.4 million in securities free of any post-termination clawback provision. *See* New Decl. ¶ 18. He cannot possibly argue that the financial harm he would suffer in not working for Sword Bio is greater than the financial harm to BioAgilytix in the non-enforcement of the Non-Compete Provision. Moreover, McNally could have chosen to work at any number of pharmaceutical or biotech companies that are in BioAgilytix's market of potential customers, just as he had done his entire career prior to joining BioAgilytix. By any measure, a failure

to enjoin McNally's breach would result in staggering harm to BioAgilytix and a windfall to McNally in reward for his malfeasance.

## V.    PUBLIC INTEREST SUPPORTS ISSUANCE OF A TEMPORARY RESTRAINING ORDER

The public interest supports entering a TRO to enjoin McNally from misappropriating BioAgilytix's trade secrets and to enforce the Support Agreement. "Generally, 'the public interest is served by enforcing contractual obligations, including reasonable restrictive covenants, between consenting parties." *SimpliVity*, 204 F. Supp. at 351 (quoting *Iron Mountain Info. Mgmt., Inc. v. Viewpointe Archive Servs., LLC*, 707 F. Supp. 2d 92, 112 (D. Mass. 2010)). McNally "signed these restrictive covenants and knowingly chose to assume the risk of going to work for a competitor without waiting the requisite time as outlined in the legal agreements." *Cynosure LLC*, 2022 WL 18033055, at *16 (cleaned up). Moreover, "it will also serve the interest of the federal government and Massachusetts in encouraging business development by protecting confidential information and trade secrets." *Found. Med., Inc.*, 2025 WL 563067, at *3. "Given the public interest in enforcing valid contracts and protecting trade secrets, this factor weighs in favor of a preliminary injunction." *DraftKings Inc.*, 732 F. Supp. 3d at 121..

## CONCLUSION

For the reasons set forth above, Plaintiff BioAgilytix Labs, LLC requests an order:

1. Temporarily restraining:

    a.  Defendants from copying, sharing, disclosing, or using in any way any of BioAgilytix's confidential or proprietary data or information or trade secrets, whether electronically stored, in hard copy, or otherwise violating Sections 3(a) and 7 of the Employment Agreement or Section 4(a) of the Support Agreement;

    b.  McNally from working for or on behalf of Sword Bio in violation of the restrictive covenants included in McNally's Support Agreement for a period of 12 months, and Sword Bio from

employing or otherwise engaging McNally in breach of the Support Agreement, or otherwise violating Section 6 of the Support Agreement;

c.  McNally from calling on, soliciting or attempting to solicit any BioAgilytix customer that McNally contacted or engaged in business with on behalf of BioAgilytix during the term of his employment or about whom McNally improperly misappropriated confidential information regarding, or from providing material assistance or support to any third party to do so, or otherwise inducing or attempting to induce any such customer to limit or terminate its relationship with BioAgilytix or from providing material assistance or support to any third party to do so, for a period of 12 months, or from otherwise violating Sections 6(a) of the Employment Agreement or Section 5(b) of the Support Agreement and Sword Bio from interfering with or otherwise causing or participating in a violation of Section 6(a) of the Employment Agreement or Section 5(b) of the Support Agreement;

2.  Ordering Defendants to submit to a mutually agreed-upon third-party computer forensics expert to perform a comprehensive review of McNally's personal devices, and any other location in which BioAgilytix's confidential and proprietary information and/or trade secrets were or may be stored, including any devices owned by Sword Bio, at Defendants' cost, to determine any improper retention, transfer or use of such material and to remediate and confirm that such information and trade secrets have been deleted; and

3.  Ordering Defendants to immediately return to BioAgilytix all of BioAgilytix's trade-secret and confidential information within their possession, custody, or control, in whatever form, including all copies and derivatives thereof.

## <u>LOCAL RULE 7.1 CERTIFICATION</u>

Pursuant to Local Rule 7.1, I, the undersigned counsel for plaintiff hereby certify that on May 12, 2025, I conferred with counsel for defendants via email and video conferencing between

April 29, 2025 and May 8, 2025 in an attempt to narrow or resolve the issues raised in plaintiff's motion.

Dated: May 12, 2025

/s/ Christopher Kaczmarek

Christopher Kaczmarek, BBO No. 647085
ckaczmarek@littler.com
LITTLER MENDELSON, P.C.
One International Place
Suite 2700
Boston, Massachusetts 02110
Telephone:    617.378.6000

James M. Witz (*Admitted Pro Hac Vice*)
LITTLER MENDELSON, P.C.
321 North Clark Street, Suite 1100
Chicago, IL 60654
Telephone:    312.795.3246
E-mail: jwitz@littler.com

Miguel A. Lopez (*Admitted Pro Hac Vice*)
LITTLER MENDELSON, P.C.
900 Third Avenue, 8th Floor
New York, NY 10022
Telephone:  212.583.2595
E-mail: MALopez@littler.com

Tanner McCarron (*Admitted Pro Hac Vice*)
LITTLER MENDELSON, P.C.
Three Parkway
1601 Cherry Street, Suite 1400
Philadelphia, Pennsylvania 19102.1321
Telephone:    267.402.3000
E-mail: tmccarron@littler.com

Attorneys for Plaintiffs
BIOAGILYTIX LABS, LLC

## **CERTIFCATE OF SERVICE**

I hereby certify that, on May 12, 2025, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF filing systems, which were then served upon:

Kimberly A. Alley, Esq.
Ruberto, Israel & Wiener
255 State Street, 7th Floor
Boston, MA 02109
kaa@riw.com


Matthew L. Mitchell
Morse
CityPoint
480 Totten Pond Road, 4th Floor
Waltham, MA 02451
mmitchell@morse.law.com

*/s/ Christopher B. Kaczmarek*_____
Christopher B. Kaczmarek